UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DARRYL JOHNSON,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 17-cv-06561-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 24

Plaintiff Darryl Johnson ("Johnson") moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Plaintiff not disabled and therefore denied his application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. and Title XVI, 42 U.S.C. § 1381 *et seq*. The Commissioner cross-moves to affirm. For the reasons stated below, the court grants in part Johnson's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings.

I.    **PROCEDURAL HISTORY**

Darryl Johnson is a 62-year-old resident of Berkeley, California. He dropped out of school in the 11th grade and joined the military at age 17. Administrative Record ("A.R.") 525. He was honorably discharged from the Navy after a year. A.R. 525. After leaving the military, he worked as a security guard for three different companies and had two subsequent jobs providing in-home care. A.R. 525. He was last employed in 2007 or 2008. A.R. 37, 525.

On October 22, 2013, Johnson filed an application for Social Security Disability Insurance ("SSDI") benefits and an application for Supplemental Security Income ("SSI") benefits, alleging a disability onset date of September 1, 2010. A.R. 59, 216-19, 220-28. His claim was based on

1  various physical and mental impairments, including mental health issues, memory loss, back

2  problems, neck problems, range of motion in his arms, and joint problems.  A.R. 59.  The

3  applications were initially denied on April 21, 2014, and again on reconsideration on September 18,

4  2014.  A.R. 129-32, 133-36, 140-44, 146-51.  On October 16, 2014, Johnson filed a request for a

5  hearing before an Administrative Law Judge ("ALJ").  A.R. 153-54.  ALJ Kevin Gill held a hearing

6  on August 17, 2016.  A.R.  32-57.

7      After the hearing, the ALJ issued a decision finding Johnson not disabled.  A.R. 13-23.  The

8  ALJ determined that Johnson has the following severe impairments:  cervical and lumbar

9  degenerative disc disease and degenerative joint disease of the bilateral shoulders.  A.R. 15.  The

10  ALJ found that several of Johnson's alleged disorders are non-severe, including hyperlipidemia,

11  bipolar disorder, and personality disorder.  A.R. 16.  The ALJ found that Johnson retains the

12  following residual functional capacity (RFC):

13      [C]laimant has the residual functional capacity to perform light work as
    defined in 20 CFR [§§] 404.1567(b) and 416.967(b) except: this person can
14      lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk,
    or sit each for six hours in an eight hour day; can push and/or pull as much
15      as he can lift/carry; occasional reaching overhead on the right; frequent
    bilateral handling and fingering; frequently climb ramps and stairs;
16      occasionally climb ladders, ropes, and scaffolds; frequently balance, stoop,
    kneel, or crouch; occasionally crawl; this individual should never work at
17      unprotected heights; never operate a motor vehicle; this individual should
    also avoid work around heavy machinery or concentrated exposure to other
18      hazards.

19

20  A.R. 19.  The ALJ did not assess Johnson's mental RFC.  Relying on the opinion of a vocational

21  expert who identified Johnson's past jobs at the hearing and testified that Johnson could perform his

22  past relevant work of home attendant as actually performed, the ALJ concluded that Johnson is not

23  disabled.  A.R. 22.

24      The Appeals Council denied Johnson's request for review on September 14, 2017.  A.R. 1-

25  6.  The ALJ's decision therefore became the Commissioner's final decision.  *Taylor v. Comm'r of*

26  *Soc. Sec. Admin*., 659 F.3d 1228, 1231 (9th Cir. 2011).  Johnson then filed suit in this court pursuant

27  to 42 U.S.C. § 405(g).

28

## II.    THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1.    At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.    At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.    At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.    At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.    At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    Johnson's Testimony

At the August 17, 2016 hearing before the ALJ, Johnson testified that he lives alone.  A.R. 36.  He usually walks or rides his bicycle to get around.  A.R. 36.  He completed tenth grade.  A.R. 36.  Johnson served in the Navy for approximately a year before he was honorably discharged.  A.R. 37.  He last worked in 2007 as a live-in caregiver, a position he had for about three years.  A.R. 37.  Prior to that job, he worked as a dishwasher for a motel.  A.R. 37-38.  He testified that he is no longer able to work due to his mental disability and his physical limitations.  A.R. 38.

Regarding mental disability, Johnson testified that he went to a doctor around 2009 or 2010 and explained that he had been experiencing issues with his memory.  A.R. 38.  Johnson tried to see a mental health professional, but kept failing to connect with the doctor and eventually became discouraged and gave up.  A.R. 39.  He tries to keep tasks simple, like making microwave meals, so he can pay attention in a 1-2 minute time span.  A.R. 40.  He testified that he usually avoids conversations with people, being in public places, and crowds because it is too much to deal with.  A.R. 40.  Sometimes conversations are so complex that he has to "back away."  A.R. 40.  Johnson stated that, because of his depression, he "[doesn't] even function in society, [he] just stay[s] home."  A.R. 43.  He has "always had issues with authority," which was part of what led to his discharge from the military.  A.R. 50.  That issue also affected him in school, because he "kept getting in trouble for speaking out."  A.R. 50.  Johnson testified that his issues getting along with people also affect his personal life, because he "get[s] frustrated trying to communicate."  A.R. 50.  He becomes "defensive" and has to "suppress . . . old aggressions."  A.R. 51.  Johnson testified that he has "done anger management" to help with these issues.  A.R. 51.

Regarding physical limitations, Johnson testified that he stays in bed every day because getting up is so painful.  A.R. 40.  He explained that he often has to choose between getting up and

dealing with the pain, or lying in bed hungry. A.R. 43. He feels constant pain in his left arm, just above the elbow, which makes it impossible to put his arm down. A.R. 45. He also feels pain in his knees, neck, and shoulders. A.R. 46. Johnson testified that he has arthritis, and his doctor has told him that he is eventually looking at either hip replacement or knee replacement. A.R. 42. The arthritis makes his knees pop and causes a limp when he walks. A.R. 46. He testified that while walking is painful, he can ride a bicycle without pain, although the physical exertion of riding causes pain when he gets home. A.R. 46. Johnson testified that he has bone spurs in his neck that cause a sharp pain through his body when he turns his head. A.R. 42. Doctors have explained to him that surgery could make it worse. A.R. 42. The tremors in his upper extremities are constant. A.R. 41. When he could no longer work as a dishwasher, he started working as a live-in caregiver. A.R. 44. He testified that he would perform his duties as "best I could," but the tremors were a "handicap . . . because it was an embarrassment." A.R. 44. He can do some household chores, but it is limited: "Sometimes I can, sometimes I can't." A.R. 46.

On a typical day, Johnson has the television on. A.R. 47. He does not have a remote so he just leaves it on one channel all day long. A.R. 47. He will get up to use the bathroom, and he will "[l]ook at the kitchen and decide if I can stand long enough to deal with it." A.R. 47. Because of the tremors, he is "always in a state of concern." A.R. 47. He is afraid to take a shower because "something is going to give out." A.R. 47. If he can manage to make something to eat, he is back in bed as quickly as possible. A.R. 47. Sometimes he is "overwhelmed with everything" and he "would cry or have emotional things happen to where I'm stressing." A.R. 47. Johnson testified that he "kind of feel[s] trapped out of fear." A.R. 47. He rides his bike when he needs to go somewhere. A.R. 48. He does some grocery shopping, but it is limited since sometimes his hands will give out and he will drop the bags. A.R. 48.

Johnson testified that he went to rehab for cocaine use in 2000, and spent a year "getting that out of my life." A.R. 44. He graduated from "biblical study programs," and afterward returned to work. A.R. 44. He testified that he has had no relapses with crack cocaine since 2000. A.R. 45. He also testified that he had never taken ecstasy, but implied that it was possible that he ingested ecstasy when using crack cocaine, because he was not certain about how they manufacture crack

cocaine or what they put in it. A.R. 45. He testified that he sometimes drinks alcohol, but not excessively, and that he has never had a problem with alcohol. A.R. 49.

Johnson testified that he had been in a domestic violence relationship where his partner got violent and stabbed him with a knife. A.R. 50.

### B. Relevant Medical Evidence

#### 1. Treatment Records

The treatment records for Johnson primarily show emergency room admissions. Johnson explains that "[d]ue to poverty and homelessness, [he] often frequented emergency departments, Highland Hospital most of all, for his medical care." Pltf. Mot. at 8.

Emergency department records from 2010 show that Johnson presented for pain in his right shoulder and elbow. A.R. 567. He reported no prior history of similar problems. A.R. 567. In April 2010, he reported that he had paperwork for a spinal MRI and a referral for physical therapy but had not followed up on either. A.R. 565.

Johnson's 2011 medical records mostly show treatment for acute injuries. On January 3, 2011, Johnson was seen at Alta Bates Summit Medical Center ("Alta Bates") reporting injuries following an assault in a park. A.R. 375, 377, 559. He reported that both he and his girlfriend were assaulted and he sustained a blow to the head. A.R. 377. Johnson reported at that time that he had carpal tunnel in his right wrist and acute arthritis in both shoulders. A.R. 380. He complained of neck pain and moderate upper back pain. A.R. 377. He received a CT scan, which revealed multiple contusions to the face and a possible zygomatic fracture. A.R. 375, 378. He was prescribed Vicodin and Ibuprofen and discharged in good condition. A.R. 378-79, 381-82. On June 1, 2011, Johnson was seen at Highland for acute injuries from a stab wound in his chest. A.R. 414. He was treated, prescribed pain medication, and referred back to the clinic for follow up care. A.R. 414, 557. At that time, he reported that he was mugged by several young men. A.R. 572. He later reported that he actually had been stabbed by his girlfriend. A.R. 396, 400. In July 2011, Johnson went to the emergency room after he was hit by a car while riding his bicycle. A.R. 554. In October 2011, he presented with swollen lymph nodes and was treated for STDs. A.R. 552.

Records from 2012 also show that Johnson primarily received treatment for acute injuries.

In February 2012, he was admitted to the emergency room after being assaulted by his girlfriend in the park. A.R. 548. Treatment records show that he was intoxicated. A.R. 548. On September 23, 2012, he went to the emergency department of Alta Bates, stating that he had been hit on the back of the head and on his left face with a beer bottle. A.R. 372, 543. He reported at that time that he had a history of arthritis. A.R. 372. A CT scan revealed a facial fracture; he was prescribed Vicodin and advised to follow up with his physician if his condition worsened. A.R. 373. In October 2012, Johnson received surgery relating to the assault. A.R. 570.

Johnson's 2013 and 2014 records show that he continued to report pain in his shoulders, neck, lower back, knees, hips, and right hand. A.R. 394, 398, 453, 476, 583, 586, 600, 721. On January 8, 2013, X-rays of his shoulders and spine resulted in a diagnosis of arthritis. A.R. 389. In April 2014, he was referred to an acupuncture clinic. A.R. 484-85. In October 2014, Johnson received a CT scan of his spine that showed mild to moderate spinal stenosis with disk herniation. A.R. 583. There are treatment notes relating to Johnson's pain symptoms from approximately March 2012 through December 2015. A.R. 720-744. It appears that he primarily received treatment through pain medication and muscle relaxants. A.R. 722-23, 725, 730, 740.

Johnson's medical records show complaints of psychiatric issues. In December 2013, Johnson screened negative for depression and PTSD. A.R. 459. However, in October 2014, he received a psychiatric referral for complaints of depression and anxiety. A.R. 583. Johnson received counseling at Lifelong Medical Center from March 22, 2016 through August 18, 2016. A.R. 766-86.

Johnson reported or received treatment relating to substance use on multiple occasions. On May 30, 2013, Johnson was stopped by BART police for exposing himself. A.R. 704. He had an unsteady gait, slurred speech, and was mildly combative. A.R. 704. The incident was attributed to alcohol. A.R. 704. On July 16, 2013, Johnson was treated for a concussion that was attributed to cocaine intoxication. A.R. 613, 621, 629, 660. On October 24, 2013, Johnson tested positive for cocaine. A.R. 442. On December 10, 2013, Johnson admitted to recent use of crack cocaine. A.R. 448. In May 2014, Johnson was admitted in an unresponsive condition to the emergency department at Sutter Health. A.R. 499. He reported that he had experienced sudden difficulty

walking and fell down. A.R. 499. That same day, he tested positive for ecstasy. A.R. 515.

## 2. Treating Sources

### a. Joann Wojick, LCSW

Johnson received counseling from Joanne Wojick, LCSW, from March 22, 2016 through August 18, 2016. A.R. 766-86. Johnson presented for memory issues, depression, and sleep disturbance/insomnia, as well as for relationship concerns. A.R. 779. Wojick noted that Johnson had received a prior diagnosis of PTSD through his General Assistance evaluation. A.R. 777. In her initial assessment, Wojick obtained Johnson's history, including information on his family and relationships, developmental history, sexual issues, social supports, legal needs, educational needs, employment history, military service, trauma history, psychiatric illness history, prior treatment for mental health and addiction, and history of substance use. A.R. 779-86. Wojick indicated that Johnson's psychiatric illness history included anxiety, depression, insomnia, PTSD, and cognitive issues such as poor memory and difficulty expressing thoughts. A.R. 782. Johnson reported that he began realizing he had these issues within the last three years, although Wojick noted that the age of onset might have been earlier. A.R. 782. Wojick wrote that she did not use any "evidence-based screening tools for either mental health or substance use." A.R. 783. Wojick observed that Johnson dressed appropriately, was groomed well, had a cooperative attitude and even mood, had normal thought process and content, and was able to answer questions adequately. A.R. 782. Wojick noted, however, that Johnson became overwhelmed when thinking about current stressors and needed a moment to clear his head. A.R. 782. She assessed a GAF score of 45.[2] A.R. 778.

_____

[2] "There are five axes in the DSM diagnostic system, each relating to a different aspect of a mental disorder:

Axis I: This is the top-level diagnosis that usually represents the acute symptoms that need treatment; Axis I diagnoses are the most familiar and widely recognized (e.g., major depressive episode, schizophrenic episode, panic attack). Axis I terms are classified according to V-codes by the medical industry (primarily for billing and insurance purposes).

Axis II: This is the assessment of personality disorders and intellectual disabilities. These disorders are usually life-long problems that first arise in childhood.

Axis III: This is the listing of medical and neurological conditions that may influence a psychiatric problem. For example, diabetes might cause extreme fatigue, which may lead to a depressive episode.

After her initial assessment, Wojick met with Johnson five times between March 2016 and August 2016.  A.R. 767-86.  On April 6, 2016, Johnson "mainly discussed current relationships," which he described as "off and on conflictual."  A.R. 775.  On May 13, 2016, Johnson was "irritable upon arrival," and reported being overwhelmed and feeling depressed.  A.R. 773.  Wojick noted that he wanted to miss the appointment to sleep and avoid interacting with other people.  A.R. 773.  Wojick and Johnson discussed finding ways to cope and bring him out of depression, and Johnson reported feeling better at the end of the session.  A.R. 773.  On July 20, 2016, Johnson reported feeling "lousy," and mainly discussed interpersonal issues with his partner and mother.  A.R. 771.  On August 4, 2016, Johnson discussed ongoing interpersonal issues with his girlfriend, which he stated caused him stress.  A.R. 769.  On August 18, 2016, Johnson reported continuing to experience stress over his relationship with his significant other.  Wojick provided coaching on interpersonal issues and maintaining his apartment.  A.R. 767.

On August 15, 2016, Wojick completed a mental impairment questionnaire.  A.R. 535-40.  She indicated that she based her opinions on Johnson's history, medical file, and progress and office notes.  A.R. 535.  Wojick noted Johnson's diagnosis of PTSD.  A.R. 535.  She stated that he "exhibits marked anxiety, disruption in thought process, memory and sleep, low mood + desire to interact w/ others or engage in outside activities, experiences of repeated trauma, unstable interpersonal relationships, poor judgment, limited insight."  A.R. 535.  Wojick wrote that Johnson's condition is chronic, and he is in need of regular treatment for the next several years to show improvement.  A.R. 535.

Wojick opined that Johnson is extremely limited in his ability to complete a normal workday

---

Axis IV: This section identifies recent psychosocial stressors—the death of a loved one, divorce, loss of a job, etc.—that may affect the diagnosis, treatment, and prognosis of mental disorders.

Axis V: This section identifies the patient's level of function on a scale of 0–100, where 100 is the highest level of functioning. Known as the Global Assessment of Functioning ("GAF") Scale, it attempts to quantify a patient's ability to function in daily life."

*Cantu v. Colvin*, No. 13-cv-01621-RMW, 2015 WL 1062101, at *6 (N.D. Cal. Mar. 10, 2015); *see also* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) ("DSM–IV") at 27-34.  Higher scores correspond with higher ability to function.  The DSM-IV been replaced by the DSM-5, which eliminated the multiaxial system of diagnosis.

and workweek uninterrupted by psychologically based symptoms, and in his ability to perform at a consistent pace without an unreasonable number and length of rest periods. A.R. 538. She also opined that Johnson had marked limitation in the following areas: ability to remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out very short and simple instructions; carry out detailed instructions; maintain attention and concentration for a two-hour segment; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervisions; work with or near others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; set realistic goals, or make plans independently of others, pay bills and attend to personal finances; perform home safety and maintenance tasks; and do shopping and cook food. A.R. 537-39.

Wojick indicated that Johnson's thought process often gets derailed, impacting his memory and ability to carry out instructions. A.R. 537. She wrote that Johnson is very easily distracted. A.R. 538. She also noted that his symptoms interfere with his ability to work with others, that he is dependent on input from others and has trouble acting independently. A.R. 538. Wojick opined that Johnson would likely be "off task" for more than 30% of each work day, and he would likely be absent from work five or more days per month. A.R. 540. She noted that Johnson had been inconsistent in being present for treatment. A.R. 540. Wojick indicated that Johnson's substance use is ongoing, but that his mental impairments would still be disabling without substance abuse, since he uses substances to self-medicate, mask symptoms of anxiety, and avoid his trauma history. A.R. 540.

//

//

### b. Neha Gupta, M.D.

On August 30, 2016, Neha Gupta, M.D., completed a residual functional capacity questionnaire relating to Johnson's physical RFC. A.R. 759-65. Dr. Gupta assessed Johnson's limitations based on medical findings of tremors in his upper extremities, lumbar stenosis, and osteoarthritis in his knees and hips. A.R. 763. Dr. Gupta reported that Johnson had restrictive physical limitations, and determined that Johnson can lift or carry less than 10 pounds; can stand, walk, and sit for less than two hours each; and has manipulative limitations due to the tremors in his upper extremities. A.R. 759-60. Dr. Gupta opined that Johnson's impairments would cause Johnson to be absent from work more than three times a month and would interfere with his concentration during 50% of the workday. A.R. 765.

There are no treatment records for Dr. Gupta in the medical evidence; Johnson claims that treatment records for Dr. Gupta were submitted to the Appeals Council but were not considered or exhibited. Pltf. Mot. at 8; A.R. at 2.

### 3. Examining Physicians

### a. Rose Lewis, M.D.

On February 25, 2014, Rose Lewis, M.D. performed a consultative medical examination. A.R 428-31. Johnson's chief complaints were pain in his neck, shoulders, right hip, and back, as well as tremors in his upper extremities. A.R. 428. Johnson reported that he was diagnosed with arthritis and bone spurs, especially in his neck, and that he hears clicking sounds and has sharp pain in his neck and right hip. A.R. 428. He reported he had been experiencing these symptoms for approximately four years. A.R. 428. Johnson indicated that he had back surgery 28 years prior for a herniated disc. A.R. 429. He had recently started having pain radiating into his right thigh. A.R. 429. Johnson stated that he was able to carry a 10-pound bag of potatoes; that he can walk at least five or six blocks, but sometimes his right leg gives out at the hip; and that he can climb a flight of stairs without difficulty. A.R. 428. He also reported that he has occasional pain in his right shoulder and a great deal of stiffness in the morning. A.R. 428. He claimed that he has a tremor that sometimes causes him to drop things. A.R. 428. Johnson reported that he can take care of his personal needs on his own, and that he can do all his household chores, although sometimes he is

unable to do them because of his tremor. A.R. 428. He stated that he watches television and cooks during the day, and goes to the library to use the computer. A.R. 428. Johnson reported to Dr. Lewis that he does not drink, smoke, or use drugs. A.R. 428.

Dr. Lewis noted that Johnson "is a well-developed and well-nourished male in no acute distress but very melodramatic about his pain and his symptomatology." A.R. 428. Dr. Lewis observed that he ambulates without an assistive device, sits comfortably, and can get on and off the examination table without difficulty. A.R. 428-29. He had no difficulty taking off his shoes and socks and putting them back on. A.R. 429. Dr. Lewis noted that Johnson has a tremor that is worse when he reaches, especially on the left side, and that he had mild difficulty picking up a coin off the table with his left hand. A.R. 429. Dr. Lewis took his vitals, which appeared normal. A.R. 429. Dr. Lewis observed that Johnson could do tandem walking but was "somewhat wobbly." A.R. 429. Dr. Lewis noted that he could not do toe-heel walking, and he complained of pain in his feet. A.R. 429. Dr. Lewis diagnosed Johnson with osteoarthritis, an essential tremor, hypercholesterolemia, and status post old lumbar laminectomy for degenerative disc disease. A.R. 430-31.

Dr. Lewis provided a medical source statement on Johnson's physical RFC, opining that he can stand and walk up to six hours; can sit up to six hours; does not use an assistive device; can lift and carry up to 50 pounds occasionally and 25 pounds frequently; is capable of climbing frequently and balancing without limitations; can stoop, kneel, crouch and crawl frequently; is capable of reaching, handling, and fingering frequently; and that he has a mildly decreased range of motion of the shoulders. A.R. 431. Dr. Lewis also opined that Johnson has limitations with working at heights and around heavy machinery, and no limitations working around extreme temperatures, chemicals, dust, fumes, gasses, or excessive noise. A.R. 431.

**b.      Aliyeh Kohbod, Ph.D.**

Aliyeh Kohbod, Ph.D., completed a consultative psychiatric evaluation over a period of four days through May and June 2014. A.R. 524-532. Johnson reported to Dr. Kohbod that he believed that the onset of his depression, lack of sleep, and memory problems date back to a "young age" but "have not revealed themselves till now." A.R. 525. He told Dr. Kohbod that he had attention difficulties in school, was oppositional to authority, and was suspended many times before he

1  dropped out in the 11th grade.  A.R. 525.  He then joined the military at the age of 17, but was

2  honorably discharged after a year "when he again had difficulties with authority figures."  A.R. 525.

3  Dr. Kohbod noted that Johnson began using cocaine in 1980 and stopped in 2006 after receiving

4  treatment.  A.R. 525.  Dr. Kohbod's clinical observations state that Johnsons was "irritable and

5  anxious" during the examination.  A.R. 525.

6  Dr. Kohbod performed a series of tests, including the Wechsler Adult Intelligence Scale,

7  Fourth Edition ("WAIS-4"); General Ability Measure for Adults ("GAMA"); Minnesota

8  Multiphasic Personality Inventory, Second Edition Restructured Form ("MMPI-2R"); and Wide

9  Range Assessment of Memory and Learning, Second Edition ("WRAML-2").  The WAIS-4

10  revealed low-average scores in verbal comprehension and perceptual reasoning, borderline scores

11  in processing speed and Full Scale IQ (72), and extremely low scores in Working Memory Index

12  (1st percentile).  A.R. 526.  On the GAMA IQ test, Johnson scored 90, which is average at the 25th

13  percentile.  A.R. 527.  Dr. Kohbod opined that, because Johnson's scores on the subtests were more

14  constant for the GAMA test, his score was "possibly . . . a more accurate representation of [his]

15  cognitive abilities."  A.R. 528.

16  The WRAML-2 revealed that Johnson displays "profound weakness in attention and

17  concentration."  A.R. 528.  Dr. Kohbod noted these results were consistent with those found on the

18  WAIS and "to a lesser degree" on the GAMA.  A.R. 528.  Dr. Kohbod opined that the results showed

19  "severe memory impairment."  A.R. 528.  The MMPI-2 showed clinically relevant elevations on

20  many scales, however Dr. Kohbod noted concerns that Johnson was inconsistent in reporting his

21  symptoms, and both over- and under-reported on the validity measures.  A.R. 529.

22  Dr. Kohbod wrote that Johnson's responses "indicate pervasive thought dysfunction."  A.R.

23  531.  She noted that he reported "prominent persecutory ideation that borders on paranoid delusions"

24  and believes that other people wish to harm him.  A.R. 531.  Dr. Kohbod opined that Johnson has a

25  "significant history of acting out and antisocial behavior punctuated by poor impulse control,

26  involvement in the criminal system, and difficult with individuals in authority."  A.R. 531.  She

27  wrote that he is "likely to act out when bored" and has "conflictual interpersonal relationships."

28  A.R. 531.

Dr. Kohbod diagnosed Johnson with Bipolar I; cocaine dependence, in remission; and adult antisocial behavior. A.R. 531. Dr. Kohbod ruled out somatization disorder and generalized anxiety disorder. A.R. 531. She noted that "[t]he diagnostic picture of this case is complicated by the client's almost 30 years of cocaine abuse." A.R. 531. However, Dr. Kohbod chose bipolar disorder as the primary diagnosis over cocaine dependence because Johnson "exhibited heightened levels of distractibility before he used cocaine as indicated by his reported scholastic performance," and "[h]e has also continued to exhibit symptoms even though he has not used the drug for about 8 years." A.R. 530. Regarding Johnson's concerns that he may have PTSD, Dr. Kohbod wrote that "there is no indication in his history that he should be experiencing this condition." A.R. 530. Dr. Kohbod assessed a GAF score of 55. A.R. 531.

Dr. Kohbod concluded that, "[r]egardless of the root cause of his mood and anxiety issues, Mr. Johnson is clearly suffering from a severe and pronounced memory and attention problem that would prevent him from holding down meaningful employment." A.R. 530. She opined that he showed marked deficits in memory, attention, and concentration. A.R. 532. Dr. Kohbod wrote that Johnson's "deficits in memory and concentration would prevent him from engaging in most job related activities," and "he would be unable to remember basic job duties at the present time." A.R. 532.

### c. Martin Held, M.D.

Martin Held, M.D., a psychiatrist, performed a consultative psychiatric evaluation on April 2, 2014. A.R. 463-69. Dr. Held noted that Johnson had no prior psychiatric treatment. A.R. 463. Johnson's chief complaints were bone spurs in his neck, tremors, anxiety "trying to explain things," back surgery, and acute arthritis. A.R. 463. Johnson reported that he came to the exam half an hour early because he was anxious to "mak[e] sure he came." A.R. 463.

Dr. Held noted that Johnson reported trouble sleeping and that he attributed it to anxiety, but did not characterize any consistent concerns that kept him awake other than concern about his inability to sleep. A.R. 464. Johnson also reported anhedonia and brief periods of suicidal ideation. A.R. 464. Dr. Held noted that Johnson complained that his memory problems had been getting worse over the past year or two. A.R. 464.

During the mental status examination, Dr. Held observed that Johnson was cooperative, and for the most part, open and focused. A.R. 466. He wrote that Johnson appeared slightly disheveled, somewhat thin, and presented with an evident tremor. A.R. 466. Dr. Held noted that Johnson became perseverative at times, particularly when talking about his tremors or memory issues. A.R. 466. Johnson's mood was euthymic and he did not appear discouraged or depressed, although Dr. Held noted some anxiety and pressure at times during the exam. A.R. 467. With regard to his memory, Johnson was able to remember seven numbers forward but reported that he could not do it backward. A.R. 467. He remembered 3/3 objects correctly immediately, and 2/3 after five minutes. A.R. 467. He was able to talk about the neighborhood he lived in in Chicago 14 years ago, and remembered that he lived in Stockton before becoming homeless. A.R. 467. His fund of knowledge was normal. A.R. 467. With regard to calculation, Johnson refused to do serial 7s and stated, "I'm not good in math." A.R. 467. He attempted serial 3s but stopped and said, "It's not there, it's a struggle to pull it out." A.R. 467. He could not calculate how many nickels were in $1.35. A.R 467. However, he was able to correctly calculate change back from a dollar. A.R. 467. With regard to concentration, Johnson was correctly able to follow a three-step command and spell "WORLD" forward without any difficulty. A.R. 467. When asked to spell it backward, he stated, "I can't do it, it stresses me to do it." A.R. 468.

Dr. Held diagnosed Johnson with a personality disorder, not otherwise specified, and assigned a GAF score of 61. A.R. 468. He noted that there was inconsistency to Johnson's performance on the exam, and stated that "[i]t is not entirely clear . . . what, if any, memory issues the claimant actually has." A.R. 468. He noted that further psychological testing might be useful in that respect. A.R. 468. However, he opined that Johnson's ability to give a "fairly full history and answer most of the questions appropriately and accurately contrasted with his level of complaint about his memory." A.R. 468. Dr. Held opined that it would be unlikely that there would be much change in Johnson's status over the next twelve months. A.R. 468.

Dr. Held concluded that Johnson was able to perform simple and repetitive tasks and detailed and complex tasks; accept instruction from supervisors; and interact with coworkers and the public. A.R. 468. He opined that Johnson should be able to perform work activities on a consistent basis

15

without special or additional instruction.  A.R. 468.

### 4. State Agency Medical Consultants

L. Colski, M.D., reviewed Johnson's records and assessed his mental RFC on April 17, 2014.  A.R. 59-68.  Dr. Colski opined that Johnson's mental impairments cause no restriction in activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentrations, persistence, or pace; and no episodes of decompensation.  A.R. 67.  On reconsideration dated September 15, 2014, Karen Ying, M.D., reviewed the records and affirmed that Johnson's mental impairments were non-severe, but assigned different values: mild restriction in daily living; mild difficulty in social functioning; moderate difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation.  A.R. 119.  Dr. Ying opined that Johnson is moderately limited in several areas, including his ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  A.R. 123-24.  Dr. Ying also opined that Johnson is markedly limited in his ability to carry out detailed instructions.  A.R. 123.  Dr. Ying concluded that Johnson can perform simple tasks, interact adequately with others, travel independently, and make simple decisions.  A.R. 124-25.

C. Eskander, M.D., reviewed Johnson's records and assessed his physical RFC on April 1, 2014.  Dr. Eskander determined that Johnson's conditions result in some limitations in his ability to perform work related activities; however, he concluded that Johnson was capable of performing medium work, such as his previous job as a caregiver.  A.R. 70-72.  On September 4, 2014, J. Bradus, M.D., reconsidered Johnson's RFC and found somewhat more severe physical limitations.  A.R. 102-07.  Dr. Bradus found that Johnson is limited to light work.  A.R. 107.

## IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not

supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

**V. ISSUES PRESENTED**

Johnson challenges the ALJ's decision on several grounds. He argues that the ALJ erred (1) in weighing the medical evidence, (2) in determining his severe impairments; (3) in failing to find that Johnson's impairments meet or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d)); and (4) in determining Johnson's RFC.

**VI. DISCUSSION**

    **A. Weighing of the Medical Evidence**

Regarding Johnson's mental impairments, the ALJ discussed the medical evidence and stated that he assigned the most weight to the opinion of consultative examiner Dr. Held, "somewhat less weight" to the opinions of the state agency psychiatric consultants, and little weight to the opinions of treating social worker Wojick and examining psychologist Kohbod. A.R. 16-18. For Johnson's physical impairments, the ALJ assigned the most weight to the opinion of state agency medical consultant Dr. Bradus; great weight to the opinions of Dr. Lewis and state agency medical consultant Dr. Eskander; and little weight to the opinions of Dr. Gupta. A.R. 21-22.

Johnson argues that the ALJ erred in assigning too little weight to the opinions of Wojick, Kohbod, and Dr. Gupta, and too much weight to the opinion of Dr. Bradus.

### 1. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir.

1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

#### a. Opinions on Mental Impairments

In August 2016, LCSW Wojick completed a mental impairment questionnaire. A.R. 535-40. She opined that Johnson was extremely limited in his ability to complete a normal workday and workweek uninterrupted by psychologically based symptoms. A.R. 538. Wojick also found that Johnson had marked impairments in several areas, including his ability to remember and carry out very short and simple instructions and make simple work-related decisions. A.R. 537-28.

Dr. Kohbod completed a consultative psychiatric evaluation over a period of four days through May and June 2014. A.R. 524-32. Dr. Kohbod performed a series of tests and opined that the test results showed "severe memory impairment." A.R. 528. Dr. Kohbod wrote that Johnson's "deficits in memory and concentration would prevent him from engaging in most job related activities," and "he would be unable to remember basic job duties at the present time." A.R. 532. She diagnosed Johnson with Bipolar I; cocaine dependence, in remission; and adult antisocial disorder. A.R. 531.

The ALJ discussed these opinions and gave them little weight in favor of Dr. Held's opinion, and to a lesser extent, the opinions of the state agency psychiatric consultants. Dr. Held opined that Johnson was able to perform simple and repetitive tasks and detailed and complex tasks; accept instruction from supervisors; and interact with coworkers and the public. A.R. 468. He concluded that Johnson should be able to perform work activities on a consistent basis without special or

1   additional instruction. A.R. 468. Given these contradictions, the ALJ was required to provide

2   "specific and legitimate reasons" supported by substantial evidence to reject Dr. Kohbod's opinion.

3   *Lester*, 81 F.3d at 830.

4       Social workers are not considered "acceptable medical sources" under the regulations. *Kelly*

5   *v. Astrue*, 471 F. App'x 674, 676 (9th Cir. 2012) (citing 20 C.F.R. § 404.1513(a)). Rather, they are

6   "other sources" of evidence, and their opinions are not entitled to the same weight as those of

7   "acceptable medical sources." *Id*. As such, their opinions are reviewed under the same standard

8   used to evaluate lay witness testimony. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th

9   Cir. 2010). To discount the opinion of a social worker, the ALJ need only provide "reasons germane

10  to each witness for doing so.'" *Kelly*, 471 F. App'x at 676 (quoting *Turner*, 613 F.3d at 1223-24).

11  Accordingly, the ALJ was required to provide "germane reasons" to reject Wojick's opinion.

### i.       Kohbod Opinion

13      Dr. Kohbod completed a consultative psychiatric evaluation over a period of four days

14  through May and June 2014. A.R. 524-532. Dr. Kohbod performed a battery of tests. The WAIS-

15  4 revealed low-average scores in verbal comprehension and perceptual reasoning, borderline scores

16  in processing speed and Full Scale IQ (72), and extremely low in Working Memory Index (1st

17  percentile). A.R. 526. On the GAMA IQ test, Johnson scored 90, which is average at the 25th

18  percentile. A.R. 527. Dr. Kohbod opined that, because Johnson's scores on the subtests were more

19  constant for the GAMA test, his score was "possibly . . . a more accurate representation of [his]

20  cognitive abilities." A.R. 528.

21      The WRAML-2 revealed that Johnson displays "profound weakness in attention and

22  concentration." A.R. 528. Dr. Kohbod noted these results were consistent with those found on the

23  WAIS and "to a lesser degree" on the GAMA. A.R. 528. Dr. Kohbod opined that the results showed

24  "severe memory impairment." A.R. 528. The MMPI-2 showed clinically relevant elevations on

25  many scales, however Dr. Kohbod noted concerns that Johnson was inconsistent in reporting his

26  symptoms, and both over- and under-reported on the validity measures. A.R. 529.

27      Dr. Kohbod wrote that Johnson's responses "indicate pervasive thought dysfunction." A.R.

28  531. She noted that he reported "prominent persecutory ideation that borders on paranoid delusions"

and believes that other people wish to harm him. A.R. 531. Dr. Kohbod opined that Johnson has a "significant history of acting out and antisocial behavior punctuated by poor impulse control, involvement in the criminal system, and difficult with individuals in authority." A.R. 531. She wrote that he is "likely to act out when bored" and has "conflictual interpersonal relationships." A.R. 531.

Dr. Kohbod diagnosed Johnson with Bipolar I; cocaine dependence, in remission; and adult antisocial behavior. A.R. 531. She noted that "[t]he diagnostic picture of this case is complicated by the client's almost 30 years of cocaine abuse." A.R. 531. However, Dr. Kohbod chose bipolar disorder as the primary diagnosis over cocaine dependence because Johnson "exhibited heightened levels of distractibility before he used cocaine as indicated by his reported scholastic performance," and "[h]e has also continued to exhibit symptoms even though he has not used the drug for about 8 years." A.R. 530. Dr. Kohbod assessed a GAF score of 55. A.R. 531.

Dr. Kohbod concluded that, "[r]egardless of the root cause of his mood and anxiety issues, Mr. Johnson is clearly suffering from a severe and pronounced memory and attention problem that would prevent him from holding down meaningful employment." A.R. 530. She opined that he showed marked deficits in memory, attention, and concentration. A.R. 532. Dr. Kohbod wrote that Johnson's "deficits in memory and concentration would prevent him from engaging in most job related activities," and "he would be unable to remember basic job duties at the present time." A.R. 532.

The ALJ assigned little weight to Dr. Kohbod's opinions for two reasons: because they were "based upon claimant's inaccurate portrayal of his substance use," and "because the results of Dr. Kohbod's testing are in question due to the variability of claimant's test results." A.R. 17. With regard to the first reason, the ALJ points to a record dated December 10, 2013 where Johnson admitted to recent use of crack cocaine. A.R. 18, 448. Johnson tested positive for cocaine in July 2013 and October 2013. A.R. 442, 613, 621, 629, 660. Johnson also tested positive for ecstasy on May 1, 2014. A.R. 509. Johnson told Dr. Kohbod, however, that he had not used cocaine for about 8 years. A.R. 530. Dr. Kohbod used this information to discuss why she chose the primary diagnosis of bipolar disorder over cocaine dependence:

> When an individual is in a manic phase he exhibits symptoms similar to those that would be present if one was high from stimulant use. Similarly when they fall into a depressive state, they mimic what one would experience coming down off of cocaine. While excessive drug use causes changes in brain functioning and chemistry, the diagnosis of Bipolar I was chosen as the primary over Cocaine Dependence for a few key reasons. Mr. Johnson exhibited heightened levels of distractibility and attention problems before he used cocaine as indicated by his reported scholastic performance. He has also continued to exhibit symptoms even though he has not used the drug for about 8 years.

A.R. 530. Johnson also testified at the August 17, 2016 hearing that he had no relapses with cocaine since he went to rehab in 2000. A.R. 45. There is substantial evidence in the record supporting the ALJ's conclusion that Johnson's report of sobriety with respect to cocaine is inaccurate. Further, Dr. Kohbod discussed at length the similarities between bipolar disorder and symptoms of cocaine use, including memory loss. A.R. 530 ("[B]ipolar disorder acts in much the same way.") Given that Dr. Kohbod identified Johnson's reported lack of cocaine use as a "key reason" supporting the bipolar diagnosis, the ALJ's determination that Dr. Kohbod's diagnosis was based on inaccurate information is a specific and legitimate reason supported by substantial evidence to discount Dr. Kohbod's diagnosis of bipolar disorder.

However, the ALJ erred in discounting the entirety of Dr. Kohbod's opinion based on Johnson's inaccurate report of cocaine use. While the diagnosis of bipolar disorder may be questionable because Dr. Kohbod relied on inaccurate information in making that diagnosis, the ALJ does not explain how all of Dr. Kohbod's assessments of Johnson's mental impairments are defective for the same reason. Johnson scored in extremely low (1st percentile) in the Working Memory Index of the WAIS-4 and the WRAML-2 showed that he has "profound weakness in attention and concentration." A.R. 526, 528. Dr. Kohbod opined that the results of these tests showed "severe memory impairment." A.R. 528. She specifically recognized that, "[r]egardless of the root cause of his mood and anxiety issues, Mr. Johnson is clearly suffering from a severe and pronounced memory and attention problem that would prevent him from holding down meaningful employment." A.R. 530. Dr. Kohbod also noted that Johnson's responses "indicate pervasive thought dysfunction," antisocial behavior, poor impulse control, and conflictual personal relationships. A.R. 531. Unlike the diagnosis of bipolar disorder, Dr. Kohbod's assessment of

Johnson's specific mental impairments did not depend on Johnson's inaccurate portrayal of his substance use. In determining whether a claimant is disabled, the ALJ must consider the "medical severity of [the] impairment(s)," not simply the diagnosis attached to them. 20 C.F.R. § 416.920; *see also Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (finding that impairments such as visual disturbances, memory loss, and lack of sleep were severe). Accordingly, the ALJ did not offer specific and legitimate reasons supported by substantial evidence to discount Dr. Kohbod's opinion as to Johnson's specific mental impairments.

The ALJ's second reason to discount Dr. Kohbod's opinion was "because the results of Dr. Kohbod's testing are in question due to the variability of claimant's test results." A.R. 18. Dr. Kohbod discussed the validity of her testing with respect to the MMPI-2, which "relies on an individual's self report to assess personality and emotional status." A.R. 529. She stated that there was some concern that Johnson both under and over reported on the validity measures of the MMPI-2 and stated that the interpretation of that test should therefore be made with caution. A.R. 529, 531. However, Dr. Kohbod did not make any similar statement regarding the results from the other tests, including the WAIS-IV and WRAML, both of which show "profound weakness in attention and concentration." A.R. 528. While she did discuss variability in responses on the WAIS-IV, it was not in the context of determining the validity of the test but rather explaining why Johnson scored borderline on some measures and extremely low on others. A.R. 526-27. For example, Johnson scored the "lowest possible" on the Arithmetic subtest, and Dr. Kohbod explained at length why that subtest "taxes a primary area of Mr. Johnson's cognitive weakness." A.R. 527. There is no indication that "variability" in that context implies inaccuracy of the test. Similarly, Dr. Kohbod wrote that Johnson's results on the WRAML are given with 95% confidence. A.R. 528. The ALJ did not distinguish between the validity measures of the various tests but rather disregarded all the results wholesale.

Accordingly, the court concludes that the ALJ erred in discounting Dr. Kohbod's opinion as to Johnson's specific mental impairments.

//

//

23

### ii.    Wojick Opinion

Wojick is a LCSW who saw Johnson for five therapy sessions between March 22, 2016 and August 18, 2016.  A.R. 766-86.

On August 15, 2016, Wojick completed a mental impairment questionnaire.  A.R. 535-40. She indicated that she based her opinions on Johnson's history, medical file, and progress and office notes.  A.R. 535.  Wojick noted Johnson's diagnosis of PTSD.  A.R. 535.  She stated that he "exhibits marked anxiety, disruption in thought process, memory and sleep, low mood + desire to interact w/ others or engage in outside activities, experiences of repeated trauma, unstable interpersonal relationships, poor judgment, limited insight."  A.R. 535.  Wojick wrote that Johnson's condition is chronic, and he is in need of regular treatment for the next several years to show improvement.  A.R. 535.

Wojick opined that Johnson is extremely limited in his ability to complete a normal workday and workweek uninterrupted by psychologically based symptoms, and in his ability to perform at a consistent pace without an unreasonable number and length of rest periods.  A.R. 538.  Wojick indicated that Johnson's thought process often gets derailed, impacting his memory and ability to carry out instructions.  A.R. 537.  She wrote that Johnson is very easily distracted.  A.R. 538.  She also wrote that his symptoms interfere with his ability to work with others, that he is dependent on input from others, and has trouble acting independently.  A.R. 538.  Wojick opined that Johnson would likely be "off task" for more than 30% of each work day, and he would likely be absent from work five or more days per month.  A.R. 540.  She noted that Johnson had been inconsistent in being present for treatment.  A.R. 540.  Wojick indicated that Johnson's substance use is ongoing, but that his mental impairments would still be disabling without substance abuse, since he uses substances to self-medicate, mask symptoms of anxiety, and avoid his trauma history.  A.R. 540.

Here, the ALJ assigned little weight to Wojick's medical source statement because (1) Wojick never completed a "formal assessment" of Johnson; (2) her treatment consists primarily of family counseling; (3) her evaluation appears to rely on Johnson's subjective complaints; and (4) her assessment is "inconsistent with the absence of any mental health treatment prior to March 2016."  A.R. 17.

The court concludes that the ALJ erred with respect to Wojick's medical source statement. The first reason provided by the ALJ—that Wojick never completed a "formal assessment" of Johnson—is not a germane reason to discount her opinion. The ALJ does not describe what "formal assessment" Wojick is supposed to have completed, and the Commissioner has not provided authority that failure to use a particular method of evaluation is a germane reason to reject Wojick's opinions. Wojick had the opportunity to observe Johnson's behavior over a period of months and her assessments of his mental impairments were based on her personal observations during his counseling sessions.

The second reason, that Wojick's treatment consists primarily of family counseling, is not a germane reason to discount her opinion. Counseling regarding interpersonal relationships is not inappropriate treatment, particularly as Wojick identified unstable interpersonal relationships and antisocial behavior as impairments. A.R. 535. Wojick's opinion cannot be discredited on the basis that she provided counseling that specifically targeted identified areas of concern.

The third reason, that Wojick's August 2016 assessment was "appears to rely upon [Johnson's] subjective complaints," is not a germane reason to discount her opinion as that statement is not accurate. Wojick specifically noted in her statement that her opinion was based on Johnson's history and medical files, as well as progress and office notes. A.R. 535. Further, the report evidences that Wojick relied on her own observations during the course of treating Johnson. Thus, Wojick's assessment was based on evidence, treatment history, and observations outside of Johnson's subjective reports, and the reason given is not supported by the record.

The fourth reason, that Wojick's statement is "otherwise inconsistent with the absence of any mental health treatment prior to March 2016," is not a germane reason to discount her opinions. A.R. 17. The Ninth Circuit has "particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–300 (9th Cir. 1999) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)). Wojick specifically noted that Johnson has low desire to interact with others, poor judgment, and limited insight, all of

United States District Court
Northern District of California

which are consistent with the "exercise of poor judgment in seeking rehabilitation." *Id.* Johnson's failure to seek mental health treatment prior to March 2016 does not evidence his lack of mental impairments.

The court concludes that the ALJ erred with respect to Wojick's opinion.

### b.      Opinions on Physical Impairments

On August 30, 2016, Neha Gupta, M.D., completed a residual function capacity questionnaire relating to Johnson's physical RFC. A.R. 759-65. Dr. Gupta opined that Johnson's impairments would cause Johnson to be absent from work more than three times a month and would interfere with his concentration during 50% of the workday. A.R. 765. On February 15, 2015, Dr. Lewis performed a consultative examination. A.R. 428-31. She observed some limitations in Johnson's physical capacities, but assessed a less restrictive RFC than Dr. Gupta. A.R. 431. Non-examining state agency medical consultant C. Eskander, M.D., reviewed Johnson's records and assessed his physical RFC on April 1, 2014. Dr. Eskander determined that Johnson's conditions result in some limitations in his ability to perform work related activities; however, he concluded that Johnson was capable of performing medium work, such as his previous job as a caregiver. A.R. 70-72. On September 4, 2014, J. Bradus, M.D., reconsidered Johnson's RFC and found somewhat more severe physical limitations. A.R. 102-07. Dr. Bradus found that Johnson is limited to light work. A.R. 107. The ALJ considered these opinions and assigned the most weight to Dr. Bradus's opinion and little weight to the opinions of Dr. Gupta. Although Dr. Gupta issued a treating source statement, his treatment records are not in evidence.

Dr. Gupta assessed Johnson's limitations based on medical findings of tremors in his upper extremities, lumbar stenosis, and osteoarthritis in his knees and hips. A.R. 763. Dr. Gupta reported that Johnson had restrictive physical limitations, stating that Johnson can lift or carry less than 10 pounds; can stand, walk, and sit for less than two hours each; and has manipulative limitations due to the tremors in his upper extremities. A.R. 759-60. These restrictions would essentially limit Johnson to sedentary work. A.R. 21.

The ALJ assigned little weight to the opinions of Dr. Gupta because "they are inconsistent with the medical evidence of record and unsupported by any records of examination or treatment by

26

Dr. Gupta." A.R. 22. As noted by the ALJ, there are no treatment records for Dr. Gupta in the medical evidence; Johnson claims that treatment records for Dr. Gupta were submitted to the Appeals Council but were not considered or exhibited. Pltf. Mot. at 8; A.R. at 2.

Johnson argues that the ALJ "does not articulate which opinions are not consistent with the medical evidence of record, or which portions of the medical evidence of record do not support Dr. Gupta's opinions." Pltf. Mot. at 8. The ALJ reviewed the consultative examination Dr. Lewis performed on February 25, 2014. A.R. 21. Dr. Lewis observed that Johnson was "in no acute distress but very melodramatic about his pain and his symptomatology." A.R. 428. She observed that he ambulates without an assistive device, sits comfortably, and can get on and off the examination table without difficulty. A.R. 428-28. He had no difficulty taking off his shoes and socks and putting them back on. A.R. 429. Dr. Lewis noted that Johnson has a tremor that is worse when he reaches, especially on the left side, and that he had mild difficulty picking up a coin off the table with his left hand. A.R. 429. Dr. Lewis observed that Johnson could do tandem walking but was "somewhat wobbly." A.R. 429. Dr. Lewis noted that he could not do toe-heel walking, and he complained of pain in his feet. A.R. 429. Dr. Lewis diagnosed Johnson with osteoarthritis, an essential tremor, hypercholesterolemia, and degenerative disc disease. A.R. 430-31. She assessed physical RFCs consistent with medium work. A.R. 431. The ALJ also reviewed Dr. Bradus's opinion, which found somewhat more severe physical limitations that would confine Johnson to light work. A.R. 107. The ALJ assigned the most weight to Dr. Bradus's opinion and great weight to Dr. Lewis's opinion on the basis that they are consistent with the medical evidence of record. A.R. 21.

Dr. Gupta's RFC questionnaire is perfunctory and vague. The RFC questionnaire directs the physician to "[i]dentify the particular medical findings (e.g., physical examination findings, x-ray findings, laboratory test results, history, symptoms (including pain), etc.) which support your opinion regarding any limitations." A.R. 761. Dr. Gupta merely listed, without explanation or history, diagnoses of upper extremity tremors, lumbar stenosis, and osteoarthritis. A.R. 763. The rest of the questionnaire is merely checkbox responses without further explanation. A.R. 759-65. Particularly considering that there are no treatment records for Dr. Gupta, it is impossible to

ascertain the bases for Dr. Gupta's conclusions or Dr. Gupta's level of familiarity with Johnson's conditions. It is unclear what examination techniques, if any, Dr. Gupta used, as the record is devoid of any narrative explanation.

Johnson argues that "it is reasonable to assume [Dr. Gupta] reviewed Mr. Johnson's long history of treatment at Highland Hospital and based her opinion on that medical history and her examination," but does not cite legal authority that would permit this court to assume facts that are not in the record. Pltf. Mot. at 8. To the contrary, the regulations state that:

> The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.

20 C.F.R. § 404.1527(c)(3). "When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (rejecting a treating physician's opinion because "it was unsupported by rationale or treatment notes, and offered no objective medical findings to support the existence of [claimant's] alleged conditions").

Given the lack of any rationale or treatment notes supporting Dr. Gupta's opinion, the court finds that the ALJ did not err in assigning the opinion little weight.

**B.      Evaluation of Johnson's Medical Impairments**

Johnson argues that the ALJ erred by failing to find that his bipolar disorder and PTSD are severe impairments.

**1.      Legal Standard**

At step two of the five-step sequential evaluation for disability claims, the ALJ must determine whether the claimant has one or more severe impairments that significantly limit a claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii) and (c); 416.920(a)(4)(ii) and (c). "Basic work activities are abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (quotation omitted). The Ninth

Circuit has held that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Id.* (citation omitted). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work." *Id.* (quotations omitted). A severe impairment "must be established by objective medical evidence from an acceptable medical source," 20 C.F.R. § 416.921, and the ALJ must "consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity." *Smolen*, 80 F.3d at 1290 (citations omitted). In addition, when assessing a claimant's RFC, an ALJ must consider all of the claimant's medically determinable impairments, both severe and non-severe. 20 C.F.R. §§ 416.920(e), 416.945; *see Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008); *see also* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments [because] limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.").

### 2.    Analysis

As discussed above, the existence of Johnson's mental impairments are supported by Dr. Kohbod and Wojick. The ALJ erred in discrediting both of these opinions as to the severity of Johnson's mental impairments. While "harmless error applies in the Social Security context," *Stout v. Commissioner*, 454 F.3d 1050, 1054 (9th Cir. 2006), the court cannot conclude that the ALJ's errors with respect to those opinions is harmless. The step two analysis is a de minimis inquiry and "[a]n impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work." *Smolen*, 80 F.3d at 1290 (quotations omitted). Both Dr. Kohbod and Wojick opined that Johnson has mental impairments that would significantly affect his ability to work, including deficits in memory, concentration, attention, and social relationships. A.R. 526, 528, 530-32, 535, 537-39. Given the de minimis nature of the step two inquiry and the fact that the ALJ failed to assess Johnson's mental RFC as a result of discrediting the opinions of Dr. Kohbod and Wojick, the court cannot conclude that the ALJ's weighing of the medical evidence is harmless error.

United States District Court
Northern District of California

On remand, the ALJ should revisit the step two inquiry in light of the court's opinion on the weighing of the medical evidence.

### C. Johnson's Remaining Arguments

Johnson argues that the ALJ erred in finding that his mental impairments do not meet or equal a listing and erred in assessing Johnson's mental and physical RFC.

The court does not reach these arguments with respect to Johnson's mental impairments in light of its conclusion that the ALJ erred in weighing the medical opinions. These errors impacted the ALJ's ultimate conclusion that Johnson's mental impairments do not meet a listing, and the ALJ's failure to assess mental RFC. A.R. 20. Under these circumstances, the ALJ on remand should reevaluate the listing determination and Johnson's mental RFC assessment.

With respect to Johnson's physical impairments, the ALJ did not err in assigning little weight to Dr. Gupta's opinion and assessing physical RFC based on the opinions of Dr. Lewis, Dr. Eskander, and Dr. Bradus. Accordingly, the ALJ did not err in assessing Johnson's physical RFC.

## VII. CONCLUSION

For the foregoing reasons, the court grants in part Johnson's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings.

**IT IS SO ORDERED.**

Dated: March 26, 2019



Donna M. Ryu
United States Magistrate Judge